**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JANIELLE DAWSON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL UNIVERSITY,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:25-cv-03498<br><br>Honorable Sharon Johnson Coleman |

**RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL NATIONAL UNIVERSITY'S DISCOVERY RESPONSES**

This Court permitted narrowly tailored discovery on three discrete arbitration-related topics—nothing more. Specifically, on October 30, 2025, the Court permitted narrowly tailored, arbitration-related discovery on: (a) the exception in the arbitration agreement regarding the making of the federal direct loan or the provision of educational services for which the direct loan was obtained; (b) whether Plaintiff agreed to arbitrate; and (c) the content of the affidavit attached to National University's ("NU") Motion to Compel Arbitration. ECF No. 29. Plaintiff sought broad discovery, including merits discovery that ignores these boundaries, demands information irrelevant to the threshold arbitrability question, and contradicts the very theory of harm alleged in her own Complaint. There has been no response to the Motion to Compel Arbitration and this discovery is improper and should be denied based on the prior limitations imposed by the Court.

The core issues are simple: (1) did Plaintiff agree to arbitrate her claims; and (2) does the arbitration agreement's exception regarding the provision of educational services extend to privacy tort claims like Plaintiff's? There is little doubt as to the first issue. On the second issue, the Department of Education's ("ED") own regulations that required inclusion of that language in NU's Enrollment Agreement, and well-established basic principles of contract interpretation, answer that question conclusively—and they answer it in NU's favor.

Plaintiff's discovery requests are built on the fundamentally flawed premise that her privacy and wiretapping claims concern "the provision of educational services for which the direct loan was obtained." They do not. Contrary to Plaintiff's argument, the arbitration exclusion is not a privately negotiated carve-out; it is precise language mandated by ED's regulations, which ED requires educational institutions, such as NU, to include in enrollment agreements as part of borrower defense regulations governing federal loans in the education context. 34 C.F.R. §§ 685.300(e)-(f).

Those regulations serve a narrow purpose: they prohibit schools from entering or enforcing pre-dispute arbitration agreements with respect to borrower defense claims. *Id*. A borrower defense concerns acts or omissions of a school relating to the making of a Direct Loan or the provision of educational services for which the loan was obtained and provides a defense for repayment of that loan or recovery of amounts previously collected. *Id*; *see also* 34 C.F.R. §§ 685.401-402. Borrower-defense claims therefore address institutional misconduct affecting a borrower's obligation to repay federal student loans such as substantial misrepresentation or breach of contract relating to educational services. *Id.* Plaintiff's privacy and wiretapping claims bear no relation to loan repayment, borrower defenses, or the educational services financed by a Direct Loan. They therefore fall outside the scope of the borrower-defense arbitration restriction.[1] In fact, while Plaintiff's Motion to Compel frames tracking as "a key component of the provision of Defendant's online educational services" (ECF No. 45 at 13), the Complaint undermines this argument by characterizing this conduct as wrongful surveillance conducted for profit. ECF No. 1 at ¶ 84. Plaintiff cannot have it both ways, and her Motion to Compel should be denied.

---

[1] Applying ED's definition of "educational services" here resolves Plaintiff's Motion to Compel. More broadly, adopting ED's definition in this case requires all of Plaintiff's claims be compelled to arbitration, as explained in Defendant's Motion to Compel Arbitration (ECF No. 16). However, given the importance of the definition of the phrase "educational services," NU welcomes further briefing on this specific issue if the Court would find it helpful.

## I. FACTUAL BACKGROUND

Plaintiff first enrolled at NU in June 2023 and re-applied in December 2024. ECF No. 17, at 3–5. During her initial enrollment, Plaintiff affirmatively acknowledged NU's 2023 Enrollment Agreement by toggling a default "No" to "Yes" on the application's "Disclosures & Agreements" page. ECF No. 17-1, ¶¶ 8–10, 17. Upon re-application, Plaintiff electronically signed the 2024 Enrollment Agreement via DocuSign and initialed the arbitration provision. ECF No. 17-1, ¶¶ 19–22. Both agreements contain an identical arbitration clause requiring that all disputes arising out of or relating to the student's application or enrollment be resolved through binding individual arbitration, and both include a class-action waiver. ECF No. 17, at 5–6; ECF No. 17-3, at PageID 111–12.

Plaintiff filed this action on April 1, 2025, alleging four privacy-related claims relating to NU's alleged use of technologies embedded in its website, www.nu.edu ("the Website"). Specifically, Plaintiff alleges violations of (1) the Video Privacy Protection Act, 18 U.S.C. § 2710, et seq. ("VPPA"), (2) the Electronic Communications Privacy Act 18 U.S.C. § 2510, et seq. ("ECPA"), (3) the California Invasion of Privacy Act Cal. Penal Code § 631 ("CIPA"), and (4) the Illinois Eavesdropping Act 720 Ill. Comp. Stat. 5/14-1, et seq. ("IEA"). ECF No. 1. The Complaint does not contain any allegations regarding the adequacy or delivery of Plaintiff's courses, nor does it mention Plaintiff's loans. It does contain references to the University of Phoenix, ECF No. 1, at ¶¶ 44, 99, and Naviance, *id.* at ¶ 152, two other entities against which Plaintiff's counsel has brought near-identical suit, illustrating the disconnect between Plaintiff's pleadings and the boilerplate merits discovery she now demands.

On May 29, 2025, NU filed a Motion to Compel Arbitration, Dismiss Class Claims, and Stay Proceedings (ECF No. 16) based on the arbitration clause contained in NU's Enrollment

Agreement. For the sole purpose of determining whether the case is subject to arbitration, the Court authorized discovery on three discrete topics: (1) the exception in the arbitration agreement regarding the making of the federal direct loan or the provision of educational services for which the direct loan was obtained; (2) whether Plaintiff agreed to arbitrate; and (3) the content of Defendant's affidavit attached to its Motion to Compel Arbitration. ECF No. 29.

NU provided initial discovery responses and produced documents on January 5, 2026. ECF No. 45-4; ECF No. 45-5. After two meet-and-confers revealed vastly different understandings of the scope of "educational services," NU served amended responses and objections to Plaintiff's deposition notice. ECF No. 45-6; ECF No. 45-7. Throughout this process, NU proposed a stipulated definition for "educational services" grounded in the ED's regulations, which Plaintiff rejected. ECF No. 45-11, at PageID 345. NU also proposed a stipulation addressing the use of prerecorded videos in Plaintiff's courses, which Plaintiff rejected both because Plaintiff considered the language too narrow and because NU conditioned the stipulation on the withdrawal of overlapping Deposition Topics 4 and 5. ECF No. 45-10, at PageID 340-41.[2] Finally, on February 22, 2026, NU's counsel sent an email to Plaintiff's counsel offering to resolve several outstanding discovery disagreements in order to streamline the issues for the Court. ECF No. 45-10, at PageID 328-32. Plaintiff filed the instant Motion the following morning. ECF No. 45.

## II. STANDARD OF REVIEW

Although courts adopt a liberal interpretation of the discovery rules, the proponent of a motion to compel bears the burden to prove that the information sought is relevant and proportional. Fed. R. Civ. P. 26(b); *City of Chicago v. DoorDash, Inc.*, No. 1:21-cv-05162, 2023

[2] NU acknowledges that its counsel represented amended responses would address prerecorded videos. When NU's client raised concerns about verifying under oath which specific courses contained prerecorded videos, NU proposed a stipulation to Plaintiff as an alternative option. ECF No. 45-10, at PageID 329-30. Plaintiff rejected the proposed stipulation.

WL 3654259, at 1 (N.D. Ill. May 25, 2023).

## III. ARGUMENT

The parties' discovery dispute turns on whether Plaintiff's discovery requests and deposition topics fall within the limited scope of discovery permitted and relate to the "educational services" for which a Federal Direct Loan was obtained—and specifically, whether Plaintiff's privacy and wiretapping claims fall within that category. The arbitration exclusion in the Enrollment Agreement is a legally mandated provision to include in student agreements as a condition of participating in the Federal Direct Loan program. As such, the term "educational services" does not have a broad "common sense" definition.

Instead, "educational services" is a term of art that the Court should analyze by reference to ED's borrower defense regulations—the very regulations that required its inclusion in the Enrollment Agreement. The only place in the Code of Federal Regulations where ED has undertaken to define "provision of educational services" is 34 C.F.R. § 685.206(e)(1)(iv), which provides that the term "refers to the educational resources provided by the institution that are required by an accreditation agency or a State licensing or authorizing agency for the completion of the student's educational program." While this definition appears in a provision governing a specific cohort of loans, it reflects ED's sole articulated understanding of the phrase and is instructive of its meaning across the regulatory framework, including in the § 685.300 enrollment agreement language at issue here. *See IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005) (looking to one statutory provision to illuminate the meaning of the same term in a related provision). ED's preamble to the 2019 Final Rule confirmed this bounded understanding, explaining that "claims related to more general concerns associated with the institution's provision of educational services will not be considered" as borrower defenses. 84 Fed. Reg. 49813 (Sept. 23, 2019). And ED's

guidance on the § 685.300 provisions confirms that claims unrelatedto the making of a Direct Loan or the provision of educational services—such as personal injury tort claims or sexual or racial harassment claims—fall outside the borrower defense framework and remain subject to arbitration. Under this framework, it is apparent that Plaintiff's discovery requests do not relate to any of the Court's permitted arbitration-related discovery topics.

### A. The Arbitration Exclusion Is Federally Mandated Language That Does Not Cover Plaintiff's Privacy Claims.

Contrary to Plaintiff's assertion that *contra proferentem*, the legal doctrine that an ambiguous phrase must be construed against the party that drafted the agreement, compels Plaintiff's interpretation, the arbitration exclusion contained in NU's Enrollment Agreement is not the product of contract negotiation. Instead, the arbitration exclusion is a regulatory requirement drafted and mandated by ED that should be interpreted as such. *See* 34 C.F.R. § 685.300(d)-(e). While Illinois courts generally interpret terms according to their plain meaning, this presumption yields when a term is "otherwise defined." *Camico Mut. Ins. Co. v. Citizens Bank*, 474 F.3d 989, 993 (7th Cir. 2007). As explained below, the term "educational services," as it is used by educational institutions like NU, is defined by ED.

Even if the arbitration exclusion were ambiguous, courts interpreting contracts that include language mandated by law look to the underlying regulation and federal policy. *Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432, 436 (1st Cir. 2013); *see also Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032 (7th Cir. 1998) (when a "latent" or "extrinsic" ambiguity exists, courts consider objective evidence as to the circumstances which create ambiguity) (citation omitted). In Illinois, an instrument is only ambiguous if "the language used is reasonably or fairly susceptible to having more than one meaning[.]" *Flora Bank & Trust v. Czyzewski*, 222 Ill.App.3d 382, 388, 583 N.E.2d 720, 725 (Ill. Ct. App. 1991). In *Kolbe*, the en banc First Circuit interpreted a standard

mortgage covenant mandated by the Federal Housing Administration and held that "the fact that the Covenant was drafted and mandated by the United States *requires that its meaning be that meant by the United States when it drafted the regulation.*" 738 F.3d at 437 (emphasis added). The court reasoned that "unlike individually tailored contracts, uniform clauses do not derive from the negotiations of the specific parties," and that "[w]hen dealing with uniform contract language imposed by the United States, it is the meaning of the United States that controls." *Id.* at 436-37, 442. "Those obligations are the ones the United States intended them to be, as determined by a court, regardless of the personal interpretation offered by a party." *Id.* at 442.

By the same token, in its regulations pursuant to the Higher Education Act of 1965, ED requires schools that participate in the Direct Loan Program to include a specific, multi-sentence provision in student agreements addressing class action rights. 34 C.F.R. § 685.300(e)(3). That provision—which addresses the student's right to participate in class action lawsuits, limits the scope of that right to claims "concerning [the school's] acts or omissions regarding the making of the Direct Loan or [the school's] provision of educational services for which the Direct Loan was obtained," and specifies that the provision "does not apply to lawsuits concerning other claims"—is prescribed by ED in its entirety. *Id.* NU's Enrollment Agreement reproduces the full text of § 685.300(e)(3) in all material respects; a comparison of the two provisions confirms that NU did not draft, modify, or negotiate any portion of the arbitration exclusion. *Compare* 34 C.F.R. § 685.300(e)(3), *with* ECF No. 17-3, at PageID 112. Because the entire arbitration exclusion is placed in NU's Enrollment Agreement pursuant to—and in the form prescribed by—ED's regulations, Plaintiff cannot claim NU's proposed definition is unnecessarily complicated, nor can she invoke *contra proferentem* against language NU was required to adopt verbatim.

The sole place in the Code of Federal Regulations where ED has defined "provision of

educational services" is 34 C.F.R. § 685.206(e)(1)(iv), which provides that the term "refers to the educational resources provided by the institution *that are required by an accreditation agency or a State licensing or authorizing agency for the completion of the student's educational program*." (emphasis added). Although this definition appears within paragraph (e), which governs loans first disbursed between July 1, 2020 and July 1, 2023, it is ED's only regulatory articulation of the phrase's meaning. And where the federal government has defined a term in one provision and used the same undefined term in a related provision serving the same regulatory purpose, the defined meaning is at minimum instructive. *See IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005). This is particularly so here, where the § 685.300 enrollment agreement language was reinstated in the same 2022 rulemaking that created Subpart D, and the Department's contemporaneous preamble and guidance discussions reflect the same bounded understanding of "educational services." In the February 5, 2026, email to Plaintiff's counsel, Defendant's counsel proposed a definition anchored in that regulatory text. *See* ECF No. 45-11, at PageID 345.

In its Preamble to the 2019 Final Rule——which accompanied the regulations that created the only codified definition of "provision of educational services"—ED further explained that it "do[es] not believe it is appropriate to consider acts or omissions unrelated to the making of a Direct Loan for enrollment at the school or the provision of educational services for which the loan was made as relevant to a borrower defense claim." 84 Fed. Reg. 49813 (Sept. 23, 2019). ED, acknowledging "well-developed bodies of State law that explain this term," explained that "[t]he definition of 'provision of educational services' is based on educational resources as those resources provided by the institution that are required by an accrediting agency or a State licensing or authorizing agency for the completion of the student's educational program," which "may include an adequate number of faculty to fulfill the institution's mission and goals or successful

completion of a general education component at the undergraduate level that ensures breadth of knowledge." *Id.*

Finally, the Enrollment Agreement's own text confirms the limitation. The Agreement reads: "This [arbitration exclusion] does not apply to lawsuits concerning other claims." ECF No. 17-3, at PageID 112. Privacy and wiretapping claims are "other claims" to which the arbitration exclusion does not apply. And in contemplation of judicial gatekeeping, the Agreement continues: "only the court is to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Federal Direct Loan or the provision of educational services for which the loan was obtained." *Id.*

ED's borrower defense and procedure regulations define a "borrower defense" as "an act or omission of the school attended by the student that relates to the making of a Direct Loan for enrollment at the school or the provision of educational services for which the loan was provided." 34 C.F.R. §§ 685.222(a)(5), 685.206(c). For example, while students bringing claims for being defrauded over a school's accreditation or costs may qualify for the arbitration exception, claims for personal injury, tort, or sexual or racial harassment would not. Plaintiff's VPPA, ECPA, CIPA, and IEA claims sound in tort and are precisely what ED intended to fall *outside* the arbitration exclusion.

The discovery Plaintiff seeks could only comport with the narrow discovery topics authorized by the Court if her claims fell within the arbitration exclusion. The scope of the arbitration exclusion, a legal question resolvable with reference to the Agreement, the Complaint, regulatory text, and ED's corresponding guidance, does not require the factual discovery Plaintiff demands.

**B. Even Under Plaintiff's Definition, Her Direct Loans Were Not Obtained for the Educational Services at Issue.**

Even setting aside the definitional dispute, Plaintiff's motion fails on its own terms. The arbitration exclusion does not apply to all claims tangentially related to "educational services"; it applies only to claims concerning the provision of educational services "*for which the Direct Loan was obtained*." ECF No. 17-3, at PageID 112 (emphasis added).

Here, no Federal Direct Loan was obtained for Plaintiff's educational services. Plaintiff was charged a total of $10,723.40 in tuition and mandatory fees. Of that amount, Amazon Corporate Payments ($2,336.00) and NU institutional scholarships ($8,209.00) covered all but $178.40, and Plaintiff's Federal Pell Grant covered the remaining balance. ECF No. 45-6, at PageID 289-90. Under Title IV's packaging rules, institutions must treat Pell Grants as estimated financial assistance and may originate Direct Loans only up to the remaining cost of attendance after that aid is applied. 34 C.F.R. §§ 673.5(c)(1)(i), 685.301(a)(4)(ii)(A). Because Plaintiff's tuition was fully covered by non-loan sources before any Direct Loan was originated, the $7,300 in Direct Loans Plaintiff received was refunded to Plaintiff after all tuition was already paid through other non-loan sources. ECF No. 45-6, at PageID 290-91.

The tracking technologies at issue in the Complaint are allegedly embedded in NU's website and online course platforms—services funded by Plaintiff's scholarship, employer payments, and Pell Grant, not by her Direct Loans. Even if this Court were to adopt Plaintiff's expansive reading of "educational services" to encompass website tracking, the arbitration exclusion would still not apply because Plaintiff's loans were not obtained for those services. Plaintiff's records do not establish any nexus between the loans and educational services. Plaintiff bears the burden of establishing that her claims fall within the arbitration exclusion and thus within the scope of the Court's discovery order; she has not done so.

### C. <u>Plaintiff's Requests Exceed the Court's Authorized Scope.</u>

The parties' definitional dispute is intertwined with every contested discovery request. And when properly defined, it is clear that none of Plaintiff's discovery requests relate to the narrow topics permitted under the Court's Order.

**1. ROG No. 5-7, RFP No. 8.**

A full inventory of NU's course information is not required to determine whether Plaintiff's claims fall within the borrower-defense framework. Notwithstanding that during the period Plaintiff was actively enrolled and attending courses, her tuition was fully covered by the Amazon Career Choice program and her Federal Direct Loan disbursements were refunded to her for personal use, ECF No. 45-6, at PageID 291, NU has produced over 160 pages of documents describing certain categories of its educational services.

**2. ROG No. 3-4, RFP No. 10.**

The use or availability of prerecorded videos in Plaintiff's classes does not relate to educational services for which a direct loan was obtained, not only because there is no evidence that Plaintiff took out a direct loan to pay for classes, but also because there is no evidence that such videos are required by an accreditation agency or a State licensing or authorizing agency. Notably, NU proposed a stipulation regarding these discovery requests which Plaintiff rejected because NU asked for the withdrawal of certain superfluous deposition topics that would be addressed by the stipulation. ECF No. 45-10, at PageID 328-30.

**3. ROG No. 13, RFP No. 11-12.**

Plaintiff's requests regarding tracking technologies allegedly present on NU's Website are pure merits discovery. Plaintiff attempts to bootstrap merits-related tracking technology into the arbitration-related discovery by arguing that if tracking technologies were integrated into anything to do with education, then they fall within the arbitration exclusion. But this line of argumentation

presupposes Plaintiff's incorrect and expansive definition of "educational services." Tracking technologies layered onto course videos (as opposed to the instructional content or academic resources themselves) are not educational resources provided by the institution that are required by an accreditation agency or a State licensing or authorizing agency for the completion of the student's educational program.

Plaintiff's requests are independently overbroad because they are untethered to any defined set of online properties. While the Complaint references "nu.edu and its affiliated web properties," ECF No. 1, at ¶ 2, without identifying what those affiliated properties are, Plaintiff's discovery requests expand the target even further: the discovery definition of "Website" encompasses "any website, online portal or mobile application owned, operated, managed and/or controlled by" NU through which students "could enroll, register for degree programs and/or classes, attend classes, and/or access online content, including but not limited to prerecorded videos." ECF No. 45-1, at Definition 21; ECF No. 45-2, at Definition 16. This definition improperly conflates NU's public-facing marketing site with its separate Learning Management System—the sole platform through which student course information is accessed—and could further sweep in any student portal, mobile application, or third-party content delivery platform, with no outer boundary. ROG 13 and RFP 11-12 then ask NU to identify every tracking technology across this entire undefined universe and explain the purpose of each. Plaintiff has made no effort to tailor these requests to specific platforms connected to the vague and boilerplate conduct alleged in the Complaint.

**4. Deposition Topic No. 2-7, 11.**

Plaintiff's proposed deposition topics mirror her written discovery and, for the same reasons, exceed the scope of the Court's discovery order. Plaintiff's tuition was fully covered by the Amazon Career Choice program during the period she attended courses and her Federal Direct

Loan disbursements were refunded for personal use, and nothing Plaintiff seeks comports with ED's definition of "educational services." In addition, Plaintiff's requests are not relevant to the arbitration exception, and Plaintiff has equal or better access to this information. Additionally, preparing a witness on topics of this breadth would be disproportionate at this pre-responsive-pleading stage.

### D. **Plaintiff's Definition of "Educational Services" Would Inappropriately Nullify the Arbitration Clause.**

By contrast, the broad definition Plaintiff proposes—"services of, relating to or pertaining to education"—would improperly transform anything and everything a school does into an "educational service" under the "Federal Direct Loan" exception to the school's arbitration agreement. Although Federal Direct Loans are calculated based on a student's full "cost of attendance"—as defined by 20 U.S.C. § 1087ll to include tuition, fees, books, course materials, transportation, living expenses, and more—adopting Plaintiff's expansive reading of "educational services" to include any claim tangentially related to that broader calculation would cause the exception to swallow the rule. Such an interpretation would exclude from arbitration any claim a student could bring, even slip-and-fall injuries or parking disputes, so long as the student received any Federal Direct Loan disbursement to attend the school. Like in *Kolbe*, even if Plaintiff's reading were facially plausible, it "would seriously undermine federal [education] policy" by universalizing the arbitration exception and thus cannot lie. *Kolbe*, 738 F.3d at 437. And critically, there is no evidence in this case that Plaintiff obtained any Federal Direct Loans for tuition.

As discussed in subsection (III)(A), *supra*, this reading is contrary to ED's intent to preserve arbitration for non-borrower claims. *See, e.g.* 34 C.F.R. § 685.300(d) ("The school will not compel any student to pursue a complaint based on allegations that would provide a basis for a borrower defense claim through an internal dispute process"); 84 Fed. Reg. 49813 ("[C]laims

related to more general concerns associated with the institution's provision of educational services will not be considered"). The legal doctrine of *contra proferentem* does not apply because the language is mandated by ED regulations. Neither Plaintiff nor NU had discretion to modify the arbitration exclusion, and NU could not have legally entered into the Enrollment Agreement without including the language. Even if *contra proferentem* could apply in this situation, courts will not apply the doctrine where it produces an absurd result, as Plaintiff's proposed definition would. *Levy v. Minnesota Life Ins. Co.*, 517 F.3d 519, 523 (7th Cir. 2008) ("[When words are ambiguous] they will be construed against the drafter. Nevertheless, we are not to adopt a 'strained, forced, unnatural, or unreasonable construction, or one which would lead to an absurd result[.]'") (citations omitted).

### E. NU's Objections Are Substantive and Properly Asserted.

Finally, NU's core objection that Plaintiff's requests exceed the Court's discovery order is a substantive, case-specific objection, not a "boilerplate" invocation of overbreadth or burden in a vacuum. Plaintiff cites only unpublished, distinguishable cases to argue that NU has failed to show why its objections are improper. For example, Plaintiff cites *Loughnane v. Zukowski, Rogers, Flood & McArdle* for the proposition that a party cannot meet its burden to show why a specified request is improper by "reflexively invocating a baseless litany of unsupported objections." ECF No. 45, at PageID 4 (quoting 2019 WL 13073480, at *5 (N.D. Ill. Dec. 2, 2019)). NU's objections, specifically tied to the facts and circumstances of this case, are far from a "reflexive invocation." These vague assertions are materially different from NU's specific objection that "discovery was permitted as to the three limited topics in the Court's ECF No. entry" and that Plaintiff's requests "exceed[] that limitation and scope and [are] not relevant or proportional to the issues raised in the Motion to Compel Arbitration. Plaintiff is improperly seeking merits discovery." ECF No. 45, at PageID 190. Plaintiff's argument regarding alleged boilerplate objections ignores the multiple

meet-and-confer efforts where Defendant's counsel explained the concerns and defects with the discovery and made repeated efforts to resolve the dispute.

Plaintiff additionally argues that NU improperly asserted new objections in its amended responses that were waived upon NU's initial discovery production. To begin with, many of NU's discovery responses of which Plaintiff now complains remain unchanged. *Compare*, ECF No. 45-4, at PageID 264-65, *with* ECF No. 45-6, at PageID 295. *See also* ECF No. 45-6, at PageID 288; ECF No. 45-7, at PageID 308; ECF No. 45-7, at PageID 309; ECF No. 45-7, at PageID 309. NU expressly reserved the right to amend its responses in its initial production. ECF No. 45-4, at PageID 255; ECF No. 45-5, at PageID 270.

NU's amended responses reflect the natural evolution of the parties' meet-and-confer process. To the extent NU sharpened its objections, it did so because the parties' fundamental definitional disagreement over "educational services" did not crystallize until the various meet-and-confer exchanges, when competing definitions were first proposed. ECF No. 45-11, at PageID 345; ECF No. 45-10, at PageID 340-41. Therefore, good cause exists for the Court to excuse any failure to raise these objections earlier, if any exists. Fed. R. Civ. P. 33(b)(4); *Valencia v. City of Springfield*, 2018 WL 3056670 (C.D. Ill. June 20, 2018).

## IV. CONCLUSION

Plaintiff's discovery requests do not relate to the arbitration exception and therefore exceed the Court's discovery order. The Court should deny Plaintiff's Motion to Compel Discovery and confirm the narrow scope of discovery for the parties moving forward.

Dated: March 16, 2026.

Respectfully submitted,

By: *s/Eric P. Mathisen*
One of the Attorneys for Defendant,
National University

Eric P. Mathisen, IN Bar No. 19475-71
**OGLETREE, DEAKINS, NASH,**
**SMOAK & STEWART, P.C.**
56 S. Washington St., Suite 302
Valparaiso, IN 46383
Phone: 219-242-8666
Fax: 219-242-8669
eric.mathisen@ogletree.com

Benjamin W. Perry, TN Bar No. 034387 (admitted *pro hac vice*)
**OGLETREE, DEAKINS, NASH,**
**SMOAK & STEWART, P.C.**
401 Commerce St Suite 1200
Nashville, TN 37219
Phone: 615-687-2217
Fax: 615-254-1908
benjamin.perry@ogletree.com

## CERTIFICATE OF SERVICE

I, Eric P. Mathisen, an attorney, hereby certify that, on March 16, 2026, I filed the foregoing document using the Court's CM/ECF system, which effected service on all counsel of record.

*/s/ Eric P. Mathisen*
Eric P. Mathisen